**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------
Chinese Americans Civil Rights Coalition, Inc.

                                        Plaintiff
                                                        Case No.:  **1:21-cv-04548 (JGK)**

                -against-

Donald J. Trump
in his former official capacity as
the President of the United States, and as a private citizen

                                        Defendant
-----------------------------------------------------------------


# PLAINTIFF'S MEMORANDUM OF LAW

## IN OPPOSITION TO

## DEFENDANT'S PERSONAL ATTORNEYS' MOTION TO DISMSS


Yu-Xi (Glen) Liu, Esq. (yl3022)

Attorney for Plaintiff,

602 39th Street, Brooklyn, NY 11232

Telephone: (347)721-1383

yuxiliuny@yahoo.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................................................................2

CONSTITUTIONAL PROVISIONS AND STATUTES INVOLVED ..........................................3

STATEMENT OF ADDITIONAL FACTS ....................................................................4

    Brief Recap of the Facts Presented in the Complaint ................................................4

    The Origin of the COVID-19 Virus..........................................................................5

    The Significant Increase in Anti-Asian Americans Incidents....................................7

ARGUMENTS.................................................................................................................9

    Rebuttal to Defendant's Personal Attorneys' Argument I......................................10

    Rebuttal to Defendant's Personal Attorneys' Argument II.....................................11

    Rebuttal to Defendant's Personal Attorneys' Argument III ...................................12

    Rebuttal to Defendant's Personal Attorneys' Argument IV ...................................13

    Rebuttal to Defendant's Personal Attorneys' Argument V ....................................19

    Defendant's Personal Attorneys' Various Flaws in Their Arguments  ...................20

    The Lessons from the Supreme Court's Four Precedents........................................22

CONCLUSION ..............................................................................................................24

JURY TRIAL REQUESTED  .........................................................................................25


APPENDIX 1 - Chinese Americans Civil Rights Coalition Press Release on 05/21/2021

APPENDIX 2 – Online Affidavit to Join the Defamation Lawsuit against Trump

APPENDIX 3 - Online Affidavit Signature List

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Chae Chan Ping v. United States*, 130 U.S. 581 (1889) .................................................................22

*Dred Scott v. Sandford*, 60 U.S. 393 (1856).................................................................................22

*Korematsu v. United States*, 323 U.S. 214 (1944)........................................................................22

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ....................................................................................22


**Constitutional Provisions**                                                                  **Page**

The First Amendment ...............................................................................................................19, 20


**Statutes**                                                                                   **Page**

28 U.S.C. § 1332(a)(1) Diversity of Citizenship ..........................................................................10

28 U.S.C. § 4101(1) Defamation .................................................................................................19

## STATEMENT OF ADDITIONAL FACTS

For easy reference, Plaintiff would like to recap the facts presented in the Complaint ¶¶ 11 to 119, Pages 6 to 30.

1.  The Fallacy and Double-Standard of Naming Diseases and Virus – explain why the WHO warned against associating disease and virus with a geographical or national label. (¶¶ 11 to 14)

2.  The Timeline Since the COVID-19 Outbreak – recount how the scientific and medical community, both international and the U.S., (1) named the new virus as COVID-19, (2) advised strongly against  calling it "Wuhan virus", Chinese virus" and the likes,  (3) still "do not know the exact source of the current outbreak of the COVID-19 virus, we know it originally came from an animal, likely a bat", and (4) predict it is just a matter of time before another virus jumps from animals to human. (¶¶ 15 to 24)

3.  The Timeline Since the COVID-19 Outbreak – recount how Defendant repeatedly used defamatory terms while disregarding his own Administration officials' warning, advice and counsel not to use such terms. (¶¶ 25 to 38)

4.  A Partial List of Defendant's defamatory rhetoric during his presidency (¶¶ 39 to 57, 60 to 63, 72 to 75, 77 to 79, 81 to 84) and as a private citizen (¶¶ 58, 59, 64 to 71, 76, 80, 85 to 94)

5.  The Significant Increase in Anti-Asian Americans Incidents – present a partial list of data and specific examples to illustrate the significant increase in hostility towards Chinese and Asian Americans (¶¶ 95 to 121).

Plaintiff now would like to present the following Statement of Additional Facts (SoAF) relevant for the Court to consider, these events either came to Plaintiff's attention or occurred after Plaintiff filed the Complaint on May 20, 2021.

**The Origin of the COVID-19 Virus**

6. On Feb. 16, 2020, Senator Tom Cotton, Republican of Arkansas, spoke on Fox News, "We don't have evidence that this disease originated there, but because of China's duplicity and dishonesty from the beginning, we need to at least ask the question to see what the evidence says, and China right now is not giving evidence on that question at all." The key words here are "we don't have evidence."

7. On Mar. 16, 2020, at the White House Press Brief, Defendant said "… And it came out from nowhere." However, on the same day, Defendant used the term "Chinese Virus" in a tweet as noted in Plaintiff's Complaint (¶¶ 28).  This shows Defendant used the term "Chinese Virus" without confirmed knowledge of the origin of the virus.

8. On April 16, 2020, at a White House Press Briefing Defendant said, "we are looking at it, a lot of people looking at it, it seems make sense." At the same briefing, Dr. Fauci said, "the mutation that it gets to the point where it is now is totally consistent with a jump from animal to human." This shows Defendant had no conclusive evidence about the origin of the virus.

9. On April 24, 2020, the Republican National Senatorial Committee urged its candidates in a memo to address the coronavirus crisis by aggressively attacking China, and "Don't defend Trump,  other than the China travel ban, attack China" (Politico 04/24/2020). This shows even Defendant's own party found little positive from Defendant's handling of the pandemic, which explained why Defendant needed to find a scapegoat by adopting defamatory rhetoric.

10. April 30, 2020, when asked again what evidence he has to support the lab theory, Defendant said again "we have people looking at it strongly… I can't tell you that, I am now allowed to tell you that." On the same day, *the New York Times* reported "Trump officials Are Said to Press Spies to Link Virus and Wuhan Labs", but most intelligence agencies remain skeptical

that conclusive evidence of a link to a lab can be found, and scientists who have studied the

genetics of the coronavirus say that the overwhelming probability is that it leapt from animal

to human in a nonlaboratory setting, as was Ebola and SARS (NYT 04/30/2020).

11. May 3, 2020, Mike Pompeo, then Secretary of State, said in interview with ABC News "there

was enormous evidence that was where it began." However, neither Defendant nor Pompeo

has  shared such "enormous evidence" (ABC News 05/03/2020).

12. May 4, 2020, Dr. Fauci said, "… it was in the wild to begin with. That's why I don't get what

they're talking about and why I don't spend a lot of time going in on this circular argument."

13. According to CDC's Bulletin updated on July 1, 2020:

*The novel (new) coronavirus that first appeared in China had never been seen before, so it
quickly gained the attention of scientists around the world… Epidemiologists did field
investigations to find out how the new virus started…. Using this information, epidemiologists
determined that the virus possibly came from an animal sold at a market.*
https://www.cdc.gov/coronavirus/2019-ncov/science/about-epidemiology/identifying-source-
outbreak.html

14. On May 26, 2021, President Joe Biden ordered the U.S. intelligence community to redouble

their efforts in investigating the origins of the Covid-19 pandemic and report back to him in 90

days. (CNN 05/26/2021)

15. On Aug. 27, 2021, the U.S. intelligence report on the origins of the COVID-19 pandemic has

failed to reach any firm conclusion on whether the COVID-19 virus first found its way into

humans through contact with an infected animal or that the virus somehow escaped from a lab.

(NPR 08/27/2021)

16. On Oct. 29. 2021, the declassified report from American intelligence agencies reiterated that

the evidence to support either conclusion was thin, and that U.S. intelligence agencies know

far too little about the origin of the virus. The intelligence community has concluded that the

virus was not developed as a biological weapon. (NYT 10/29/2021)

**The Significant Increase in Anti-Asian Americans Incidents**

17. On Feb. 21, 2021, NPR reported "Anger And Fear As Asian American Seniors Targeted In Bay Area Attacks." (NPR 02/21/2021)

   1) a 64-year-old grandmother in San Jose was assaulted and robbed of cash she'd just withdrawn from an ATM for Lunar New Year gifts.

   2) a 91-year-old man in Oakland's Chinatown was hospitalized with serious injuries after being shoved to the ground by a man who walked up behind him.

   3) a 52-year-old Asian American woman was shot in the head with a flare gun, also in Chinatown.

   4) 84-year-old Vicha Ratanapakdee in his San Francisco neighborhood died after a 19-year-old man ran at him full speed and smashed his frail body to the pavement.

18. On Mar. 30, 2021, AAPI Data latest survey showed that Asian Americans have experienced hate incidents at a significantly higher percentage than the general population but are also among the least likely to report hate crimes to authorities. Karthick Ramakrishnan, the group's founder who helped lead the study said, "What our data show is that upwards of 2 million AAPIs have experienced these hate incidents since Covid-19 started, but a very small fraction of them have reported to community hotlines and an even smaller proportion have been established by law enforcement authorities as hate crimes" (NBC News 03/31/2021).

19. On Aug. 30, 2021, FBI data showed hate crimes targeting people of Asian descent rose by a whopping 70% in 2020 compared with the number of such incidents in 2019, and this increase coincided with the outbreak in the U.S. of the Covid pandemic, which some racists have unjustly blamed on Asian Americans. (CNBC News 08/30/2021)

20. On Oct. 15, 2021, NYT reported "Hate Crimes and Pandemic Lead More Asian Americans to Seek Therapy". The fear of hate crimes among Asian Americans was stoked, in part, by President Donald J. Trump's racist characterizations of the virus, which spread the false narrative that Asian American people were responsible for the pandemic. Many Asian Americans realized that hate crimes were a life-threatening reality, mental health professionals said. (NYT 10/15/2021)

21. On Oct. 22, 2021, NPR reported a new poll showed 25% of Asian Americans feared that members of their household would be attacked or threatened because of their race or ethnicity. For Asian Americans, the spike in attacks and the rising fear came with the global pandemic and the racist rhetoric from the Trump administration, including the use of derogatory terms like "Kung Flu." "Trump calling it the China virus, that's when I felt like life changed," Lisa Lu, a new mom who lives in the Bay Area, said. "And honestly, I don't want to venture out to any areas that are not diverse, and even in San Francisco and Oakland, I wouldn't walk alone." Co-founder of Stop AAPI HateManjusha P. Kulkarni said, "The fear is based not only on potential hate crimes, but even the hate incidents. They're refused service at a grocery store or at a coffee shop, they're worried about even just being verbally harassed" (NPR 10/22/2021).



22. On Oct. 25, 2021, NBC News reported Anti-Asian hate crimes increased more than 73 percent in 2020, according to newly corrected FBI data. It's a disproportionate uptick compared to hate crimes in general, which rose 13 percent. (NBC News 10/25/2021)

23. On Dec. 31, 2021, Yao Pan Ma, a 61-year-old Chinese immigrant, died of his injuries eight months after Jarrod Powell was recorded on video kicking his head repeatedly, NYPD Hate Crime Task Force said.

    The spike in hate crimes was first seen in March and April 2020, at the height of the Covid-19 pandemic, amid "negative stereotyping of Asians relating to the pandemic," according to an analysis of official preliminary police data by the Center for the Study of Hate and Extremism at California State University, San Bernardino. While hate crimes decreased overall by 7 percent in 2020, crimes targeting Asian people rose by nearly 150 percent across 16 of the country's largest cities, the analysis found. New York accounted for the largest surge, from three in 2019 to 28 in 2020.  (Yahoo!News 01/09/2022)

24. On Jan. 21, 2022, NYPD Data showed hate-crime complaints skyrocket, with anti-Asian attacks up 343% in NYC. (NYP 01/21/2022)


## **ARGUEMENTS**

Defendant's personal attorneys presented five arguments in their motion to dismiss. Plaintiff respectfully provides the following rebuttal point by point with indisputable facts, logical analysis, and legal reasoning.

**Rebuttal to Defendant's Personal Attorneys' Argument I**

Plaintiff Failed to Plead Subject Matter Jurisdiction Over Plaintiff's Claims.

    a.   Plaintiff improperly plead subject matter jurisdiction

    b.   Plaintiff lacks associational standing

25. Plaintiff is a non-profit organization registered in the state of New York. As clearly indicated in Plaintiff's name, this is a coalition formed to represent numerous individuals and community organizations in this legal action. After filing the Complaint on May 20, 2021, Plaintiff held a press conference (Appendix 1) to inform the public of the lawsuit. Given the on-going pandemic with multiple waves and continuous rise of infections and deaths across the country, Plaintiff has conducted outreach primarily through an Online Affidavit (Appendix 2).

26. To date, 377 individuals or organizations from 30 states (Appendix 3) have signed the affidavit to join / support this lawsuit against Defendant's defamation on our community. Therefore Plaintiff believes this case should be filed under the Diversity of Citizenship.

27. Our primary demand is (a) $1.00 as an apology from Defendant to every Asian American and Pacific Islanders (AAPI) living in the United States, and (b) any additional punitive damage to be determined at trial by the jury. And if awarded, all money will be donated. Plaintiff will donate the award (a & b) to establish a museum that will showcase the history of Asian American and Pacific Islanders communities and their contribution to the United States of America.

28. As Plaintiff presented in the Complaint (¶¶ 95 to 121) and the additional facts above (¶¶ 17 to 24), Defendant's racially-charged rhetoric has contributed to the significant increase in Anti-Chinese/Asian Americans incident and environment in many states across the country. Therefore, the Court clearly has the jurisdiction over this case.

**Rebuttal to Defendant's Personal Attorneys' Argument II**

This Court Lacks Personal Jurisdiction Over President Trump

    a.  The Court lacks general jurisdiction

    b.  Personal jurisdiction is lacking under New York's long-arm statute

29. Defendant's defamatory rhetoric was made on social media, TV interviews, and political rallies in many states, all of which were visible and broadcast to the general public across the country. It does not matter where Defendant lives, as his actions in this case were carried out virtually (social media) and physically (briefings, interviews and rallies) in many states, and the damaging impact to Plaintiff's community was well-reported nationwide beyond any individual state, therefore this case is well within any federal court jurisdiction. New York's long-arm statue quoted by Defendant's personal attorneys does not apply in this case.

30. Plaintiff presented numerous factual evidence in the Complaint (¶¶ 95 to 121), from specific individual incidents of Anti-Asian physical attack, to hate crime statistics released by law enforcement (e.g. FBI and NYPD) and non-profit organizations, to the expert analysis of the link between Defendant and the rising hostile environment towards Asia-Americans. Defendant's personal attorneys noticeably did not dispute any specific incidents and hate crime statistics presented by Plaintiff's.

31. Even the government attorney conceded that the *Government accepts Plaintiff's factual allegations in the Complaint evidence as true* and made it clear that the government rejects Defendant's racially-charged defamatory rhetoric.

32. The Executive Order 86 Fed. Reg. 7485, 7485 (Jan. 29, 2021) and the COVID-19 Hate Crimes Act, Pub. L. 117-13, 135 Stat. 265 (May 20, 2021) signed by the current administration further

affirmed (1) the widespread and seriousness of the rising hostilities towards Chinese/Asian American communities, and (2) the link between racially-charged defamatory rhetoric and the significant increase in Anti-Chinese/Asian American incidents.

**Rebuttal to Defendant's Personal Attorneys' Argument III:** Venue is improper in the Southern District of New York.

33. As explained above, Defendant's personal attorneys conspicuously ignored the facts that Defendant intentionally and repeatedly used the racially-charged rhetoric on numerous occasions through various platforms (online and traditional) in both official capacity and as private citizen in many states, and (2) with the biggest bully pulpit, Defendant's defamatory rhetoric was visible and often broadcast to the public across the country. Therefore, where Defendant lives is not relevant in this case.

34. In fact, since the 2016 Election Fox News has always been the most prominent tangible platform where Defendant gave interviews and spread his messages to viewers across the country, the most appropriate federal district court for this case is none other than the Southern District of New York because Fox News is based in New York.

**Rebuttal to Defendant's Personal Attorneys' Argument IV**: Plaintiff Fails to State any Claim Upon Which Relief May be Granted.

a.  Defendant's Personal Attorneys argue Plaintiff fails to state a claim for defamation per se.

35. Defendant's personal attorneys argue that "*Plaintiff alleges the phrase 'China virus' is defamatory per se*. Not so" and *"China Virus" is not a false statement*" because the CDC statement on July 1, 2020 stated COVID-19 "first appeared in China." Plaintiff has added the

same CDC bulletin in the above SoAF ¶¶ 13. Defendant attorneys even quoted Plaintiff's Complaint ¶¶ 3, 5, 128 ("The accurate statement would have been … the first outbreak of this coronavirus took place in China.") in an attempt to refute Plaintiff's claim. Defendant's personal attorneys then in Page 10's footnote of their Motion called "Plaintiff also, confusingly, alleges the origin of the virus was, and is, unknown. Compl., at ¶ 128."

36. In essence, Defendant's personal attorneys and Defendant himself have attempted to make people to believe the following four statements are the same:

- Statement A: the first outbreak of this coronavirus took place in China.

- Statement B: the new virus came from China.

- Statement C: the new virus originated from China.

- Statement D: the new virus is inherently associated with China, Chinese people and Chinese culture.

37. However, each of these four statements has distinctly different meaning and carry significant implication. Most importantly, only Statement A has been the undisputed verifiable fact from late 2019 until today.

38. In Statement B, that one object comes from one place does not mean it is originated from that place, i.e. "come-from" is not equal to "originated-from". The Sun rises from the east, and sets down in the west, but the Sun's origin has nothing to do with the east or the west at all. As illustrated in Complaint ¶¶ 127, millions of Apple's iPhone sold in America have come from China, but no one would call iPhone as "China iPhone", "Chinese iPhone", "Shenzhen iPhone" because iPhone is designed by Apple Inc., an American company based in California. Plaintiff's Complaint ¶¶ 11 to 14 presented historical facts to illustrate the Fallacy and Double-Standard of Naming Diseases and Virus. Therefore, Statement B has been supported neither

by fact nor by science. It is worth noting that Defendant's personal attorneys quoted "*The novel (new) coronavirus that first appeared in China*" from CDC statement on July 1, 2020, but did not mention CDC statement Sep. 1, 2020 which clearly stated "*These viruses have their origins in bats. Although we do not know the exact source of the current outbreak of COVID-19, we know that it originally came from an animal, likely a bat.*" (see Plaintiff's Complaint ¶¶ 20).

39. Statement C would beg for various questions: (1) did the COVID-19 virus come to its being on a wild animal that was already in China? (2) did the COVID-19 virus come to its being on a wild animal that somehow went from another country into China? (3) was the COVID-19 virus a result of scientific experiment in a lab in China? (4) did the COVID-19 virus somehow escape from a lab in China? and so on. Plaintiff's Complaint ¶¶ 20, 21, 22. 23, 24 and the above SoAF ¶¶ 6 to 16 all clearly stated the exact origin of the virus remains unknown, and scientists who have studied the genetics of the coronavirus say that the overwhelming probability is that it leapt from animal to human in a nonlaboratory setting, as was Ebola and SARS. Noticeably the U.S. intelligence community has concluded that the virus was not developed as a biological weapon (SoAF ¶¶ 16). Therefore, there is no conclusive evidence to answer any of these questions. It is worth noting that Defendant's personal attorneys did not mention any of the findings by the scientific and medical community and the reports by the U.S. intelligence community.

40. Furthermore, regarding the COVID-19's origin, even Senator Tom Cotton, Republican of Arkansas said, "we don't have evidence that this disease originated there" (SoAF ¶¶ 6) and Defendant himself said, "we are looking at it, a lot of people looking at it, it seems make sense." (SoAF ¶¶ 8). Clearly, neither "don't have evidence" nor "looking at it" would support

Statement B and Statement C. In addition, Mike Pompeo, Defendant's own Secretary of State, has never shared his so-called "enormous evidence" (SoAF ¶¶ 8).

41.  As for Statement D, it is obviously false. The COVID-19 virus has transmitted among people of all ages, genders, races, ethnicities, cultures, religions, all around the world. However, Statement D is most likely what many people, particular among Defendant's supporters, think of when Defendant used the terms "Chinese virus" and "Kung Flu".  It is also worth noting that Defendant's personal attorneys attempted to argue for "China virus", but never mention the terms "Chinese virus" and "Kung Flu". The only reasonable explanation is that even Defendant's personal attorneys know it is indefensible to use "Chinese virus" and "Kung Flu" at all. In fact, On March 18, 2020, Kellyanne Conway, White House counselor to Defendant, reacted strongly when she was told White House staffers using the term "Kung Flu". Conway said, "Of course it's wrong. That's highly offensive, so you should tell us all who it is." (The Hill 03/18/2020)

42. Defendant's first use of the phrase "kung flu" during a campaign rally in Tulsa Oklahoma. "*It has more names than any disease in history. I can name Kung flu. I can name 19 different versions of names*." The crowd cheered on. (Complaint ¶¶ 32) drew broad political backlash as a racist slur against Asian Americans. Within three days, however, it was also something else: a rallying cry for his supporters. In an interview, Jeff Yang, an author and columnist who writes about race and culture, said white Americans have long used the Anglicized term "kung fu" as a catchall to describe a range of Chinese martial arts that they have internalized through popular culture — but one that frequently has been used to stereotype Asian Americans as foreign or culturally exotic. The framing around 'kung flu' is uniquely problematic because it's not simply attaching a geographical moniker to the term. Defendant's use of "kung flu"

has effectively created a "schoolyard taunt" that is being mimicked by the president's supporters, Yang added. John C. Yang, president of Asian Americans Advancing Justice-AAJC, said his organization has registered a spike in reports of violence against Asian Americans since the outbreak began, having tracked 2,300 incidents since late March 2020. He said Trump was seeking to distract the public "from his own abysmal record" in overseeing the federal response to the virus. (WP 06/24/2020)

Defendant's personal attorney argued (page 11) that "Plaintiff then continues with a litany of anecdotal incidents in no way connected to President Trump's March 16, 2021.

43. Defendant has conflated a novel Corona virus as the "Chinese virus" or "Kung Flu" without scientific or factual basis and against advice and counsel of his own science experts. His defamatory rhetoric has real life consequences as anti-Chinese and anti-Asian hate crimes spike, putting a target squarely on the back of the Chinese and Asian-Americans.

44. Plaintiff's Complaint (¶¶ 95-119) and the above SoAF (¶¶ 17-24) presented a detailed list of specific incidents and hate crime statistics released by law enforcement agencies and non-profit organizations. In particular, ¶¶ 97, 98, 99, 100, 106, 107, 113, 116, presented the connection between racially-charged defamatory rhetoric and the significant rise of anti-Asian Americans aerosphere and attacks.

45. As reported in New York Times 03/18/2020, "Trump Defends Using 'Chinese Virus' Label, Ignoring Growing Criticism". Scott Kennedy, a China expert at the Center for Strategic and International Studies, said that past language used by Mr. Trump and his administration had eliminated any benefit of the doubt. "Given the Trump administration's long record of

statements and actions on immigration, immigrants and issues of race," he said, "use of this term can't but be interpreted as xenophobic and tinged with racist overtones."

Charlie Woo, the chief executive of Megatoys and the public policy committee chairman of the Committee of 100, said "This crisis requires science, facts and clear language, not fear-mongering, finger-pointing and xenophobia by our public servants," Mr. Woo said in a statement. "We face a global pandemic that calls for a truly global, unified response. Attempts to ascribe the virus to one culture, ethnicity or country can only hinder this effort, alienating people who could instead collaborate and support one another."

46. ABC News reported on 03/18/2021 "Trump's 'Chinese Virus' tweet helped lead to rise in racist anti-Asian Twitter content: Study."  A new study suggests that former President Donald Trump's inflammatory rhetoric around the coronavirus helped spark anti-Asian Twitter content and "likely perpetuated racist attitudes." The results, published in the American Journal of Public Health, come in the wake of a string of attacks on Asian communities in the U.S., including a series of shootings in Georgia that left six women of Asian descent dead. Researchers also found that the timing of the former president's tweet was significant. The first time he used "Chinese Virus" was March 16, 2020, and the following week saw an increase in anti-Asian hashtags and a rise in hate crimes.

Experts and policy makers warned against using inflammatory and racist tweets since they can serve as a rallying cry for hate crimes. "Don't attach locations or ethnicity to the disease, this is not a 'Wuhan Virus,' 'Chinese Virus' or 'Asian Virus,'" the World Health Organization wrote in a February 2020 bulletin.

In a wide-ranging press briefing on Wednesday, Biden administration press secretary Jen

Psaki said that damaging rhetoric from the prior administration led to "inaccurate, unfair" perceptions that threatened Asian Americans.

Hswen said it's more important now than ever for our leaders to use neutral language because inflammatory words can influence people's behavior toward particular groups. The study results, Hswen said, "confirm that nationality, race, or ethnicity should not be attached to disease nomenclature, as these names can carry pejorative connotations that can stigmatize these communities.

b.  Defendant's Personal Attorneys argue Plaintiff fails to state a claim for intentional or negligent infliction of emotional distress.

47. As Plaintiff presented in the above SoAF(¶¶ 20 Page 8),  "Hate Crimes and Pandemic Lead More Asian Americans to Seek Therapy". Many Asian Americans realized that hate crimes were a life-threatening reality, hence being subject to emotional distress in their daily life. In particular, most of the victims are senior Asian Americans who likely have limited resources, little knowledge of the legal system, and even face language barrier.

48. Given the fact that Defendant ignored not only the WHO guidelines but also the advice from his own administration officials and staffers on how to call this new virus and not to associate it with a geographical location or ethnicity, and then Defendant repeatedly use such racially-charged rhetoric even after the significant increase in Anti-Asian Americans incidents had been widely reported, Defendant's conduct certainly falls into the definition of negligent, extreme and outrageous.

**Rebuttal to Defendant's Personal Attorneys' Argument V**

The First Amendment and New York State's anti-SLAPP law preclude Plaintiff's claims.

New York Anti-SLAPP law precludes lawsuits, like this one, seeking to chill speech on matters of public concern

49. The First Amendment protects free speech, but when an untrue statement causes real harm, Defamation laws apply. Defendant's personal attorneys attempted to use the First Amendment to shield Defendant from this case. The two key questions to the claim of First Amendment in this case is (1) whether Defendant was making statement or opinion, and (2) whether Defendant's statements were verifiably factually true. Plaintiff already provided detailed analysis that Defendant's use of those terms had no verifiable evidence. Now let's focus on whether Defendant was making statement or opinion.

50. Whenever questioned why using "Chinese virus" and other similar terms, Defendant always explained "because it comes from China … I want to be accurate" (Complaint ¶¶ 29). By his own admission and insistence, Defendant was making statements, not opinions. Therefore it is necessary for Defendant to explain to the jury (1) based on what evidence he believed calling "China virus", "Chinese virus", "Wuhan virus", and "Kung Flu" was accurate, and (2) based on what evidence he believed saying "I can name 19 different versions of names", (Complaint ¶¶ 32 ) "you can call it whatever you want to call it. It's about 20 different names" (Complaint ¶¶ 34) "you know how many names? We have like 22 different names" (Complaint ¶¶ 35)

51. In addition, insisting throughout their Motion (Page 12) that "*The phrase China Virus clearly denotes the origin of a virus, confirmed by the CDC, nothing more*" Defendant's personal attorneys also confirm Defendant was making a statement, not an opinion. As explained above, the scientific and medical community, and the intelligence community, all have made it clear

there is no conclusive evidence on the origin of the virus. Therefore, Defendant's use of "China virus", "Chinese virus", "Wuhan virus" and "Kung Flu" has no factual basis. As a result, neither the First Amendment nor the New York Anti-SLAPP law apply in this case.

52. The essence of the First Amendment is to protect ordinary individual from government's censorship. Had an ordinary individual said "Chinese virus" or other similar terms, Plaintiff would not have filed this lawsuit because such individual has no power, no command of federal agencies, no daily intelligence reports, no bully pulpit, no platforms, no followers, etc., therefore he/she has no duty, no responsibility, and very little influence or impact.

53. Instead of being an ordinary person, Defendant held the most powerful federal government office in the country. According to William Barr's memo to DOJ dated June 8, 2018, Defendant alone was the executive power. Mr. Barr later was appointed by Defendant as the Attorney General of the United States. The higher official/constitutional authority one holds, the greater official/constitutional obligation/responsibility this person bears. Hence another reason why the First Amendment claim does not apply in this case.

**Defendant's Personal Attorneys' Various Flaws in Their Arguments**

Defendant's personal attorneys showed inconsistency and cherry-picking and even outright distortion in their arguments.

54. On the one hand, Defendant's personal attorneys argue against the subject matter jurisdiction, personal jurisdiction and improper venue because Defendant lives in Florida, not in New York; on the other hand, Defendant also attempts to use the New York Anti-SLAPP law to shield Defendant from the case. No attorney should try to have it both ways in the court of laws.

55. On the one hand, Defendant's personal attorneys argue (Motion Page 9) that Plaintiff's Complaint against Defendant in his private capacity was based on only one single comment during a Fox News interview on March 16, 2021, hence insufficient; on the other hand, Defendant's personal attorneys pointed to one quote "NOT their fault in any way, shape, or form" (Plaintiff's Complaint ¶¶  31) and said this one quote is enough to prove Defendant's statement was not defamatory.  In addition to again trying to have both ways, Defendant's personal attorneys have again ignored the facts. Plaintiff's Complaint presented a Partial List of Defendant's Defamatory Statements (¶¶ 39 to 94). Among the 55 statements, ¶¶ 58, 59, 64 to 71, 76, and 80 were made in political rallies, where Defendant was running for his re-election, hence in private capacity; ¶¶ 85 to 94 were made on his personal twitter account, hence in private capacity.

56. Defendant's personal attorneys argued in their Motion (Page 12) "*The phrase China Virus clearly denotes the origin of a virus, confirmed by the CDC, nothing more.*" This statement itself is distorted at best because the CDC has never made any statement to confirm the origin of the COVID-19.

57. The CDC statement of July 20, 2020, quoted by Defendant attorneys actually included the following three key sentences.

   1) *The novel (new) coronavirus that first appeared in China had never been seen before,*

   2) *Epidemiologists did field investigations to find out how the new virus started*

   3) *epidemiologists determined that the virus possibly came from an animal sold at a market*

Again, "first appeared" does not equate to "originated from". It is worth noting that Defendant's personal attorneys focused on only "first appear" the first sentence and ignore the

2nd and 3rd sentences, which clearly stated the "how the new virus started" was under investigation, and possibly came from an animal.

## The Lessons from the Supreme Court's Four Precedents

58. While our founding fathers set forth awe-inspiring founding ideals, throughout our country's history, there have been more than a few court decisions that were made on legal technicality, procedural ground, prevailing doctrine, or even constitutional textual provision at the time, nevertheless have been "*overruled in the court of history"* in Chief Justice Roberts' words.

59. In *Dred Scott v. Sandford*, 60 U.S. 393 (1856), the Supreme Court ruled against Mr. Scott because he was black, hence not a citizen, just a property of his slaveowner, and therefore had no right to sue. One could argue that this decision was consistent with the Constitution of 1787 which counted "All Other Persons" as only three fifths, not even a person. Such injustice was repudiated and overturned 12 years later by the 14th Amendment in 1868.

60. In *Plessy v. Ferguson*, 163 U.S. 537 (1896), the Supreme Court ruled against Mr. Plessy based on the so-called  "Separate but Equal" doctrine. The decision legitimized Jim Crow laws re-establishing racial segregation in the American South after the Reconstruction Era (1865–1877). This infamous "Separate but Equal" doctrine was overturned 58 years later by *Brown v. Broad of Education* 347 U.S. 483 (1954) in 1954.

61. Furthermore, two particular cases had caused grave and lasting injury targeted against Chinese Americans and Asian Americans. In *Chae Chan Ping v. United States*, 130 U.S. 581 (1889), better known as the Chinese Exclusion Case, the Supreme Court affirmed a lower court decision that denied Chae's re-entry to United States, effectively upholding the Chinese Exclusion Act 1882.

62. In *Korematsu v. United States*, 323 U.S. 214 (1944), the Supreme Court upheld the presidential executive order that "all persons of Japanese ancestry, including aliens and non-aliens" to relocate to internment camps during World War II.

63. All these four decisions gave seemingly grand legal reasonings citing the constitutional provisions and prevailing doctrines at the time, thus justifying racial discrimination, preserving racial segregation, and enforcing ethnic exclusion. Nevertheless, these decisions have always been overruled in the court of conscience, and then belatedly in the court of history by constitutional amendments and the Supreme Court's subsequent decisions.

64. However, the weight of moral conscience was so heavy that Congress felt compelled to passed resolution to apologize (the Senate in 2011, the House in 2012) for the Chinese Exclusion Act. Equally felt compelled, Chief Justice Roberts emphatically declared stated in *Trump v. Hawaii* that: *The dissent's reference to Korematsu, however, affords this Court the opportunity to make express what is already obvious: Korematsu was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'* Chief Justice Roberts went even further to repudiate the executive order: *The forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority*.

65. Following Chief Justice Roberts declaration above, Plaintiff respectfully presents to the Court and the general public this question, when a person -- who even in his private capacity always has the most prominent status within one of the two major political parties, always commands the most visible platform in public communication nationwide, and still has unparalleled influence among his supporters across the country -- knowingly and repeatedly spreads

racially-charged unsubstantiated defamatory rhetoric against one particular group of people solely and explicitly on the basis country origin, should this person be held accountable?

66. The lessons from these four Supreme Court decisions should be that it is wrong to single out one particular group of people based on unsubstantiated lies and bias, it is wrong to subject one particular group of people under racial discrimination and prejudice, and it is wrong to employ various legal tactics or pretense to justify such racial discrimination and prejudice.


## **CONCLUSION**


67. Defendant's personal attorneys in their Motion have attempted to cherry-pick and even distort the CDC statement, attempted to have both ways in their arguments, ignored many statements/findings from the scientific and medical community as well as the report from the intelligence communities that there has been no conclusive evidence on the origin of the COVID-19 virus, downplayed the numerous specific incidents and Anti-Asians hate crime statistics released by the law enforcement agencies and non-profit organizations, and attempted to claim the First Amendment's free speech clause to shield Defendant from this case. All of these attempts should be rejected by the Court.

68. The truth matters, words have consequences... especially from those in powerful and influential positions. Against the well-published WHO guidelines and the repeated advice from health officials of his own administration, Defendant intentionally repeated those defamatory words to serve his own personal and political interest with reckless level of actual malice and negligence, hence severely injuring the Chinese/Asian Americans communities in the process. If this case does not rise to the level of defamation by an individual who once held the most

powerful office and still has the most prominent influence among his supporters across the country, then nothing does.

## **JURY TRIAL REQUESTED**

69. A jury trial will allow Plaintiff to call (1) some victims to testify their experience of being attacked either verbally or physically, or being subject to fear and emotional distress, and (2) some expert witness to testify the link between Defendant's racially defamatory rhetoric and the intensified Anti-Asian Americans environment.

70. A jury trial will also allow Defendant to explain himself on what evidence he repeatedly called the coronavirus as "Chinese virus", "China virus", "Wuhan virus" and "Kung Flu", and "19 / 20 / 22 different names", etc., whether he was aware of the significant increase in Anti-Asian Americans incidents, and why he did not follow the advice from his own administration senior officials and the White House staffers not to use such defamatory terms.


Both Plaintiff and Defendant deserve a fair and open trial by jury and under the bright daylight. Plaintiff respectfully request a jury trial.


**Dated: Jan. 28, 2022**                    **Respectfully submitted,**

                                           _  /s/ yuxi liu                    _
                                           Yu-Xi (Glen) Liu, Esq. (yl3022)

                                           Attorney for Plaintiffs, (347)721-1383

                                           602 39th Street, Brooklyn, NY 11232